# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION.

| | |
|---|---|
| NEDELJKA BAJALO, ) <br> ) <br>       Plaintiff, ) <br> ) <br>   v. ) <br> ) <br> FRONTAGE LABORATORIES, ) <br> INC. ) <br> ) <br>       Defendant. ) | Case No.24-cv-8009, <br> Judge Manish Shah, Judge Presiding. |

NOW COMES your Plaintiff, Nedeljka (Neda) Bajalo, by and through her attorneys, The Moran Law Group, and complaining of defendant Frontage Laboratories, Inc., through its registered agent, Farah Denahan, states as follows:

## JURISDICTION AND VENUE

1. This court has jurisdiction under 28 U,S.C. **§§1331 and 1332 as well as** article 6 of the Illinois Constitution, 1970, of all "justiciable" matters, including this one.

2. Defendants include both reputational defendants as well as contract defendants . (a

3. Violations of the federal Animal Welfare Act.

4. At all times relevant to this complaint, Defendant Frontage's upper management was aware of the defamatory statements of co-workers set out below and on information and belief, solicited the statements or otherwise affirmed their contents to get out of contract liabilities

## FACTS COMMON TO ALL COUNTS:

5. This is a removed action, where plaintiff did not contest removal. Under 28 U.S.C. § 1441 (a). the matter is properly before this court .

6. Venue is proper. See 28 U.S.C. § 1391.

7. On or about October 31, 2022, Plaintiff was hired by Defendant as a "Senior Director," Veterinary Operations/Attending Veterinarian, reporting to Dr. Abdul Mutlib, the current CEO of Defendant Frontage. (Exhibit A is a true and correct copy of Defendant's offer letter which was made by a person or persons having the authority to make such an offer.)

8. Dr. Mutlib promised Plaintiff that she would be in charge of the Frontage Global Veterinary Program. She was tasked with the following responsibilities among other things:

   a. responsibility for all veterinary-related services including experimental surgeries;

   b. to advise management on veterinary issues related to animal care;

   c. to develop and implement an Institutional Animal Care and Use Program in compliance with the Animal Welfare Act, as amended, 2007;

   d. to assist in preparation of study protocols; revise and develop SOP and Study Specific Procedures as needed;

   e. to provide administrative discretion to various levels of technical personnel;

   f. to ensure maintenance of appropriate records (animal medical records);

   g. to participate in the company's sponsor training;

    h. to develop, enforce and implement animal laboratory infectious control and safety programs;

    i. to liaison to outside agencies (AAALAC, USDA, etc. and others; or other committees (IACUC, CVC);

    j. Maintain relevant knowledge of practices, policies and regulations (e.g., USDA, AAALAC).

9. The terms of Plaintiff's engagement as chief veterinarian were contained in the offer letter dated October 5, 2022, and attached to this complaint and made part of same as <u>Exhibit A</u>: A starting salary of $180,000 is stated, payable biweekly, plus a $10,000 relocation allowance, eligibility for a bonus, participation in a stock equity plan, both long and short-term disability to be provided by Frontage. The relocation amount was paid.

10. Defendant paid a COLA of 3.5 per cent per year which applied to plaintiff and her salary.

11. At all times relevant to this complaint, Defendant, its officers and agents, were aware of the fact that Plaintiff was purchasing a condominium at a cost of $430,000.00 and all encouraged her to do so, despite her serious misgivings as to her job stability, the lack of an organizational chart, etc. In fact plaintiff met with Farah Denahan and was told at least three times that her position was secuire and she should buy the condo unit.

12. Abouts two months after her hire, Plaintiff requested and received a copy of the applicable organizational chart.

13. The chart showed Plaintiff reporting to Farah Denahan, the vice president of Frontage and head of Experimur (a wholly owned subsidiary of Frontage).
14. The chart was received from Lucy Touma-Youakim, the Senior Director of Quality Assurance.
15. Frontage was a contract research organization that offers product, such as drug development services to Life Science and other companies.
16. Another employee, Mark Andracki, Director of Chemistry, began to verbally attack Plaintiff right after she started without apparent consequence to himself..
17. Shortly after the incident noted above, the Plaintiff heard a very loud argument between Lucy Touma and Mark Andracki and Bjorn Thorsrud in which it was commented how Mark's behavior is "inappropriate." Plaintiff asked Lucy afterwords if she was okay, and she mentioned Thorsrud's comment. Lucy commented that Bjorn Thorsrud liked to stir up things and cause problems.
18. Lucy Touma and others prevented Plaintiff from doing her job tasks. Lucy barred Plaintiff from creating and posting door sheets to permit the recording of daily animal care operations in the "animal room" because, she claimed, that it was not in compliance with "GLP," (good laboratory practice), while Plaintiff tried to explain to her the Animal Welfare Laws were above GLP and controlled.
19. At all times relevant to this complaint, plaintiff had a special relationship with Defendant having worked at Experimur.Labs, a wholly-owned subsidiary of defendant Frontage.
20. In early November 2022, Plaintiff could not find the manager of the Vivarium Section, Yolonda Bradshaw, who was assigned to report to Plaintiff. Plaintiff

asked a senior officer, Bjorn Thorsrud, if Bradshaw was working full time and he responded that he did not know.

21. For the first days of Plaintiff's tenure, Yolonda should have worked more than 360 hours vs. the 206 or so hours that she actually worked according to her "sign in" sheets. Further, Yolonda continued to report to work late and passively aggressively bullied Plaintiff by avoiding performing assigned tasks as part of her job duties and by asking to do herr work "differently" to delay and sabotage the animal welfare operations and failed to do or complete multiple work assignments.

22. In January 2023, Yolonda entered her office while Plaintiff was in the meeting room and her glass door was closed. Plaintiff reported this to Kelly Powers, the HR representative and was advised to meet with Yolonda, and send her a follow-up email. This was done on January 6, 2023.

23. On January 25, 2023, Yolonda Bradshaw was placed on a 30-day PIP as she continued to fail to complete multiple work assignments. By the end of the probationary period, February 25, 2023, Yolonda Bradshaw had not completed the majority of the tasks assigned to her in the PIP and possibly could have faced serious consequences. But to avoid such consequences, Bradshaw sent a letter to Farah Denahan and Kelly Powers claiming that Plaintiff was discriminating against her based on Yolonda's physical disability. However, every email sent by Plaintiff to Yolonda was reviewed and edited by Kelly Powers before being sent to Bradshaw. The latter's February 22, 2023, letter is completely false and written in retaliation as to Plaintiff, her supervisor for the PIP placement Bradshaw was on.. The PIP was dictated by Powers who had experience with them.

24. Plaintiff is not licensed in the United States. but she had received a letter from the FDA (Food and Drug Administration) which had the same effect.
25. On or about September 11, 2023, the plaintiff first discovered that she had been defamed.

## COUNT ONE: SALARY

26. Defendant stated in its Offer Letter that it would pay Plaintiff $180,000 a year. There is no language in the agreement providing for a cancellation of that sum and Plaintiff has done nothing to trigger any reduction in the payment terms, especially considering the actions of Defendant and its agents encouraging Plaintiff (a) not to resign and (b) to buy the condominium she presently resides in.
27. Plaintiff was extremely financially and reputationally harmed as she turned down positions paying more money.

## COUNT TWO -ANIMAL WELFARE ACT CONCERNS

28. While reviewing as part of her work, animal health records, Plaintiff found one dog could not be accounted for the month of October 2022. There was none of the required recordkeeping, euthanasia, adoption, or otherwise. The law requires that such records be kept for a minimum of three years.
29. A co-worker, Lucy Touma, prevented the Experimur backup veterinarian, Dr. Lauren Brierly, from addressing the SOP (Standard Operating Procedure for handling of moribund animals and the appropriate criteria for humane euthanasia. According to Plaintiff, Lucy repeatedly commented "why" on not giving the Attending Veterinarian {Plaintiff} the authority to do her job. Lucy did not change her comment on the final version,of her report.

30. Defendant failed to obtain the AAALAC accreditation in August 2022 and Plaintiff started working on the second attempt shortly after she was hired.

31  Bjorn Thorsrud, chair of the IACUCU, divided up responsibility between himself, backup veterinarian Dr. Brierley and Plaintiff, saying:" Let's divide and conquer," assigning Plaintiff to work on the AAALAC Program description. Bjorn did not finish his sections on the remaining issues.  The response letter was sent to AAALAC on or about December 28, 2022.

32 In sum, Plaintiff had no authority to do her job competently as it is defined in the Animal Welfare Act, in PHS (Public Health Services) Policy and Guide for The Care and Use of Laboratory Animals, all of which apply here.

  After a  facility study concluded, three pigs were left.  A female was housed next to `a male who mated with it and the female suffered a severe rectal prolapse.  Plaintiff asked tech Adam Arroyo to secure the door between the male and female pigs on several occasions.  He failed to do this, and Michael Frey, in performing a necropsy, confirmed  that the female was bearing 7 fetuses. There was no company protocol that allowed for the pigs' mating.

## COUNT TWO:  ANIMAL WELFARE ACT

34. One technician, see above, Quan Nguyen,  asked Plaintiff if she liked pork and if she would like to take some "food" home while he was necropsing a pig.  Later he told Plaintiff that he needed help with a mouse who had "a tumor on his back" and it could not breathe.  This occurred while the technician was practicing on mice without supervision. Plaintiff, assessing the situation, informed the tech that he had

squeezed the mouse too hard while trying to hold and gavage it but that the purported tumor was the mouse's own shoulder. When Plaintiff informed Quan's supervisor, Michael Frey, about the situation he responded that Quan admitted that he didn't have any experience when hired but facility management still allowed him to practice unsupervised, on the animals.

35. The same technician, Quan Nguyen, euthanized two rats in the small mouse anesthesia chambers where he believed that the number "2" on the chamber meant two rats per chamber. In reality, this was a gas flow instruction, posted on the wall next to the anesthesia chamber. Following the incident, Plaintiff requested from Farah Denahan the funds to purchase adequate euthanasia chambers. Denahan referred Plaintiff to Mark Andracki (facility chemist) who, after Plaintiff identified the product, informed her that Farah Denahan told him that the facility currently does not have the money for purchasing the appropriate equipment and will attempt to purchase it when money comes in.

36. Mice, rats and rabbits to be euthanized were placed in the same room where the euthanasia was performed in violation of the Animal Welfare Act's regulations.

37. Storage of feed is also regulated. On reporting the problems, Ms. Denahan referred Plaintiff to Mark Andracki for assistance. For the first time in her career, Plaintiff found that a chemist was in charge of animal care and space.

38. At one point, Plaintiff noticed that an Emily Chelmecki was doing a necropsy improperly and Plaintiff told her to keep a scalpel close to the carcass and not to lift her hand in a high circle. Emily said that her actios were okay and that she knew what she was doing. Denahan later told Plaintiff that Emily would be

"retrained." Following this confrontation, Emily enlisted her sister, a lawyer, to check Plaintiff's public records. She found that Plaintiff had sued one of her employers, years ago, and told others this was what Plaintiff made her living. Defendant's own lawyer, Steven Sitley, told Plaintiff's present attorney that Plaintiff was following her "playbook" in suing Defendant. .

39. Plaintiff also pointed out to the technicians and management that the animal carcasses were not being properly exsanguinated (bled out) to allow for reliable histology samples. This was not corrected until a new pathologist complained and the company had to redo the slides. I

40. In November or December of 2022, Plaintiff discovered that several technicians were doing intraocular dosing of rabbits without proper restraint. Plaintiff informed senior management who did nothing. In 2023, FDA inspectors found the same issue, and issued several citations. The report was never shared by management with Plaintiff. A copy is available at https://www.fda.guidance-compliance-regulatory-information/cder/foia-electronic-reading-room and it is not proprietary.

41. One co-worker, Faye Schulte, killed at least 12 rabbits while orally dosing them. The incidents are recorded in the "Status Change" forms, and one is referred to in a text message.

42. At least 7 rabbits that were on Training Protocol when the Plaintiff was hired as the Principal Investigator were dead.

43. Dogs from client studies are used for practice while on study protocol which is unacceptable according to animal care and use laws and regulations.

44. Animal care personnel repeatedly told Plaintiff that toxicology technicians would draw blood from the rabbits and not stop their bleeding violating the Animal Welfare Act regulations. The blood was visible on the floor and in the animal cages. Adam Arroyo and Rigoberto Garcia in particular, and according to their own admission, complained about this issue many times to Farah Denahan, but she did not act. Plaintiff also reported the issue verbally to Farah, and she informed Plaintiff that Erika Aitken, who held an office position, informed her that it is okay and "normal" for rabbits to bleed into the cage long after the actual bleeding is completed. This is wrong. It is neither "normal" or acceptable conduct under the Act and its regulations.

45. On March 30, 2023, after Plaintiff received a text message from Adam Arroyo, Animal Care supervisor and one of Plaintiff's direct reports, that they had botched the blood draws again and there was blood all over in the animal room." The picture of rabbit blood on the floor followed. Plaintiff emailed upper management to ask to put in place measures to stop this conduct. Management sent a warning to Plaintiff to stop using her personal cell phones and to delete the pictures, citing s company policy that personal phones cannot be used for taking pictures, in direct contradiction to Plaintiff's work responsibilities. Management stated that only the company's own camera can be used for this purpose.

46. Plaintiff, who was not aware of such a policy, apologized and requested in writing to obtain the company's camera but it was never provided. Many people in the facility took such pictures with their personal phones to capture animal health issues, including animal care personnel like Adam Arroyo, who had texted the

picture of blood on the floor in the rabbit room. After reporting this incident in writing, the Plaintiff's situation became extremely difficult and she was let go a few weeks after reporting this serious animal welfare issue, in retaliation for reporting it.

47. Many violations occurred when someone left a controlled substance exposed for hours without proper recording as required by the Act and its regulations. Plaintiff noted in November 2022 that a controlled substance, "sodium pentobarbital" used to euthanize animals, was left for hours and even overnight in the room where the euthanasia was performed without any supervision. She brought this to Farah Denahan's attention, and was again referred to Mark Andracki for problem resolution.

48. During that time the facility was trying to renew its Illinois controlled substance license and to obtain a DEA license for controlled substances. The facility asked the Defendant to help with State of Illinois licensing, but they did not disclose that their previous license was a "chemical" one, and not a research license. After discussing the issue with Dr. Brierley, Brierly informed the Plaintiff that the facility had a "Chemical" license that had expired.

49. After the research license was obtained in the name of Andracki, the Plaintiff kept pushing for appropriate storage and oversight of sodium pentobarbital and accurate recording of used amounts of controlled substances. . The technicians, led by Michael Frye, were not happy that they now had to return controlled substances after they finished use and they were complaining about not having unrestricted access to them. Plaintiff sent at least a few emails to Andracki with forms that could

be used for tracking the control substance usage and told him that the usage must be recorded and it was not being recorded. Andracki told the Plaintiff that he will take care of it, but he did not.

50. During this period, a DEA representative informed the facility that they will come on site regarding the facility's intention to obtain a DEA license.

51. They did come and when they arrived, some never seen before records of controlled substance usage were in the secure room's folder
.
Plaintiff on information and belief believes that Andracki entered the controlled substance usage retroactively.

52  Plaintiff observed rats in Dr. Thorsrud's study to be without food after 2 pm and she asked Alissa Kruis, a toxicology technician, if the animals were fasting due to a study protocol.

53. She was very abrupt and defensive in her response, stating that the company does not have enough people to feed the animals on time. Plaintiff brought Dr. Thorsrud in the room and asked that the animals be fed in a timely manner. There were many instances when they did not have their food for hours.

54. Animal research is based on eliminating variables to receive reliable data. The way it was done at the facility did not allow for this consistency and the animals were starved unnecessarily.

## COUNT III : REPUTATIONAL INJURY

55. Plaintiff recently discovered that due to a late response under the Illinoi Personnel Records Act that other staff were making false and defamatory statements about her and her work

56. One person, a John Bernal, apparently caused a job offer in Texas to be rescinded based on his comments re: plaintiff.

57. Another, a Clarie Trincot,, though never actually working with Plaintiff, made numerous claims that constituted defamation per se, including but not limited to claiming that Plaintiff was incompetent in her work though she (Claire) had no training as a veterinarian and that Plaintiff created a toxic" work environment. For example, though conceding no personal knowledge, Trincot said that Plaintiff "aggressively screamed at Lucy." Further, she concedes that she cannot give "specifics" as to what was said or the "direct cause" of Plaintiff's anger but "it was loud."

   58. Trincot gave her "overall impression" that "most people" had a "negative" working relationship with Plaintiff "though I cannot speak for everyone"

   She falsely stated that she "worked closely with Neda (plaintiff) and the rest of the IACUC committee "from mid-March to mid-May working on addressing AAALAC accreditation and blanes Plaintiff for the denial of accreditation. "During our first response to AAALAC," she (Neda or Plaintiff) worked "basically independently," and our accreditations was not awarded." [sic]

   59. Regarding Plaintiff, Trincot stated categorically that "every document she prepared (speaking of Plaintiff). "was extremely poorly written, poorly formatted, sloppy, and inconsistent with collaborative edits." She falsely stated to management "that Neda cannot follow an email chain and she can't keep track of a document." She, Trincot, then falsely claimed to upper management that Plaintiff did not know how to euthanize a dog, that "Plaintiff has no

concept of study protocols, daily schedule, study schedules, LP, facility Documentation and failed to look at a dead rabbit "for several hours". Trincot also stated falsely that "a tech recently needed help putting dogs down for necropsy and that she (plaintiff) had zero idea what vein to use or how to do it."

60. Trincot also defamed Plaintiff, stating in her letter to management, "She (plaintiff) has a very poor working knowledge of our facility's current animal housing procedures. She has a very poor knowledge of carcinogenic studies and basic cancer biology in general, with absolutely no understanding of how tumors are formed or scientifically analyzed. This statement is.false.

61. A co-worker named Erica Aitken, who again did not work with Plaintiff, also made a false claim that Plaintiff produced a "toxic" work environment. Aitken's repeated use of the word "toxic" constituted *defamation per se* based on the dictionary meaning of "toxic" as "poisonous" and she is telling her claims to upper management. In addition, she falsely asserted that "I have heard her (Plaintiff) asking "others" "what size needles."

62. Yolonda Bradshaw made numerous defamatory comments about Plaintiff, both in writing and orally, stressing that Plaintiff was incompetent in her work including but not limited to claiming that Plaintiff was engaged in "continuous misconduct" without stating what it was, and that she and Plaintiff had a "conflict" beginning after 11/11/2022. Yolonda asserts that at that time, 11/11/2022, she disclosed to Plaintiff that she had a disability (physical). Bradshaw conceded in writing that she had made numerous written and verbal

"reports" to Frontage management, about Plaintiff, which may have cost Plaintiff her job. The information in her reports was false.

63. Yolonda acknowledged a meeting with the vice-president of the facility, Bjorn Thorsrud, though organizationally she was now reportimg to Plaintiff. After Falsely claiming that Plaintiff accused her of going behind her back "to Bjorn and Supida, Bradshaw asserts, falsely, that Plaintiff retaliated and intimidated her, claiming that Plaintiff (without any explanation)"undermining my initiatives" (again no specifics) and a statement as to whom in management Yolonda shared her false "statements with. It is known because Bradshaw admitted that on or about February 22, 2023, Yolonda requested an "urgent" meeting with Farah Denahan to discuss her false allegation that Plaintiff created a "hostile work environment," ignoring that she (Yolonda) was on a PIP and was not completing her PIP requirements in a timely manner. Another junior staff member, Trincot, wrote falsely on February 15, 2023, that during an IACUC meeting, that Plaintiff had made numerous questionable statements. Trincot's statements were false when made and under Illinois statute, were *per se* defamatory on the dates reported. Bradshaw gave no facts to support her allegations.
These serious omissions appear to corroborate Plaintiff's fear that all these false allegations were orchestrated by Frontage upper management to obfuscate the string of false allegations concerning Plaintiff, such as Plaintiff creating a hostile work environment," Bradshaw claiming (and ignoring) that she (Yolonda) was on a PIP and not completing its requirements in a timely manner. Plaintiff falsely made statements that were false when made and per se defamatory, including but not limited to the dates of 1/30/23, 12/7/2022, 1/8/2023 when Yolonda Bradshaw said she called Frontage management to falsely claim that all of Plaintiff's actions were to intimidate her in retaliation for what we do not know.. But Bradshaw gives no facts to support her allegations that Plaintiff created a "hostile work Environment," claiming (and ignoring) that she (Yolonda)

was on a PIP which Kelly Powers, head of Frontage's Human Resources, had placed her on, including not completing the PIP'S requirements in a timely manner.

Further, Trincot falsely wrote on 2/15, 2023, that during an IACUC meeting, Plaintiff falsely made statements that were false when made and per se defamatory on dates she reported, including but not limited to the dates of 1/30/23, 12/7/2022, 1/8/2023, dates where Yolonda said

she had called Frontage management and falsely claimed that all of Plaintiff's actions were done to intimidate her and in retaliation. Bradshaw gives no facts to support her allegations including which pf Plaintiff's actions were in retaliation. This serious omission buttress's Plaintiff's fear that all these allegations were orchestrated by Frontage management to cover up the defamatory remarks and in retaliation for Plaintiff's exposing the facility's shortcomings.

WHEREFORE**,** NEDELJKA BAJALO**,** prays for judgment in her favor and against Defendant for past and future pain and suffering, permanent reputational injury and past and future medical bills, past and future wage and business, past and future emotional distress and frustration, other losses flowing from this, including the purchase of a condominium, prejudgment interest, and any other relief that this Court deems appropriate. including salary.

**Plaintiff demands trial by jury.**

Respectfully submitted,

/s/ John T. Moran, Jr.
John T. Moran, Jr.
Attorney for Plaintiff
566 W. Lake Street
Suite 101
Chicago, Illinois 60661
(312) 405-4474
j.t.m.moran@gmail.com

2

# EXHIBIT A
# Offer of Employment

**October 5, 2022**

Neda Bajalo, DVM, MSc.

9212 Bishops View Circle Cherry Hill, NJ 08002

nedabajalo@gmail.com

773-301-8545

Dear Neda:

On behalf of Frontage Laboratories, Inc., I am pleased to offer you the full-time position of **Senior Director, Veterinary Operations**.  This offer is contingent upon successful completion of references, drug screen and background check. You will directly report to **Dr. Abdul Mutlib, EVP, Global Preclinical Services.** Your compensation will be **an annual salary of $180,000, payable bi-weekly.** We are also offering you **a one-time $10,000 relocation allowance** (100% refundable if you were to leave Frontage within 2 years).



**Bonus:** You will also be eligible for a **15% bonus** based on your personal performance against performance targets, as well as performance of the company and the business unit you will be part of. If bonuses are awarded, and you are eligible, your bonus will be prorated based on your hire date.

**Equity:** You will be eligible to participate in the Frontage Laboratories, Inc. Stock Equity Plan. The number of shares will be determined by the Frontage Board of Directors.

**Benefits**: We offer medical, vision and dental insurance for you and your family effective the 1st day of your employment. We also offer Company paid life, short-term disability, and long-term disability insurance, also effective the 1st day of employment; a Flexible Spending Account program; and a 401(k) Plan with 6% match which you are eligible to participate in the first quarter after employment (November 1, 2022) with immediate vesting.

**Paid Days Off**: Upon commencement of employment, you will be entitled to **10 Days** of Paid Days Off (PDO) for vacation (prorated and accrued in your first year), paid sick time earned 1 hour for every 40 hours worked, capped at 40 hours; **8** paid days off for holidays. Effective January 2023, Experimur will be rolled over to Frontage's benefits and you will be eligible for 20 days of PTO.

**Please make certain that you bring with you on your first day, supporting I-9 documents that establish both identify and employment authorization. I have attached the list of acceptable documents. Please note, if you provide something from Column A, that one document will suffice. If you are providing documents from Column B & C, then we need one from B and one from C.**

*Nothing contained herein is intended to create an employment agreement or to restrict the right of our organization to terminate employment at any time, with or without cause. As with all*

*employees of our organization, you will be subject to all policies and practices of our organization as set forth in the employee handbook, the policy manual and/or other communications, as each may be updated, amended, or changed from time to time.*

We look forward to welcoming you to the Frontage Laboratories team. If accepting this offer, please confirm by signing below and returning one copy of this letter to me at your earliest convenience.

Sincerely,

*Farah Denahan*



Farah Denahan,

Vice President

**Frontage Laboratories, Inc.**

Email: fdenahan@frontagelab.com

Phone: 773-254-2700 x232

---

Please sign below to confirm acceptance of this offer. Your signature below confirms that you either do not have a non-compete agreement with a prior employer, or you have fully disclosed the terms of any agreement.

Accepted By:

_____   10/20/2022
me: **Neda Bajalo, DVM, MSc**           Date:

**EXHIBIT A  - THE OFFER LETTER- ABOVE**